# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

* * *

| | |
|---|---|
| INSURANCE COMPANY OF THE WEST, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>RENO QUALITY HOMES, INC., a Nevada corporation, HIGH VALLEY DEVELOPMENT, LLC, a Nevada limited liability company, ROBERT N. FITZGERALD, an individual, SHERYL A. FITZGERALD, an individual, THE ROBERT N. FITZGERALD IRREVOCABLE TRUST, a Nevada Trust, THE SHERYL FITZGERALD IRREVOCABLE TRUST, a Nevada Trust, ROBERT N. FITZGERALD, as the Trustee for The Robert N. Fitzgerald Irrevocable Trust and as Trustee for The Sheryl Fitzgerald Irrevocable Trust, DOES I through X, inclusive; ROE CORPORATIONS I through X, inclusive,<br><br>Defendants. | Case No.: 2:17-cv-01272-RFB-DJA<br><br><br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This matter came before the Court for a non-jury trial on February 21, 2020. The Court has heard the evidence presented by both parties and the arguments of counsel. Having carefully considered all of the admitted exhibits and evidence, the testimony of the witnesses, the trial statements of the parties, the legal authority bearing on the issues, and the arguments of counsel, the Court hereby issues the following Findings of Fact and Conclusions of Law:

/ / /

# FINDINGS OF FACT

1. In 2006 and 2007, Plaintiff Insurance Company of the West ("ICW") issued for principal Reno Quality Homes, Inc. ("RQH") six bonds related to the construction and development of the Mountain View Estates subdivisions units 1A and 2A. These bonds secured the completion of approximately $3,000,000 of work.

2. As consideration for ICW's issuance of surety bonds, RQH, High Valley Development, LLC,[1] Robert N. Fitzgerald, Sheryl A. Fitzgerald, The Robert L. Fitzgerald Irrevocable Trust and The Sheryl. Fitzgerald Irrevocable Trust (collectively the "Indemnitors") executed a General Indemnity Agreement (the "Indemnity Agreement").

3. The Indemnity Agreement includes, but is not limited to, the following terms and provisions:

> 1. INDEMNITY. The Undersigned shall indemnify and keep indemnified the Surety against any and all liability for losses and expenses of whatsoever kind or nature, including attorney fees and costs, by reason of having executed or procured the execution of Bonds, or by reason of the failure of the Principal or Indemnitors to perform or comply with the covenants and conditions of this Agreement.
>
> ***
>
> An itemized statement of the payment or compromise, sworn to by an officer of the Surety, or the voucher or vouchers or other evidence of the payment or compromise, shall be prima facie evidence of the fact and the amount of the liability of the Undersigned under this Agreement.
>
> ***
>
> 2. COLLATERAL. If for any reason the Surety believes it may sustain a loss or expense on a bond, Surety may, from time to time, demand, and upon Surety's demand, the undersigned shall deliver over to Surety, cash or collateral acceptable to Surety as to amount and form, to cover any contingent losses or expenses and any subsequent increase thereof. The Surety shall have the right to use the cash or collateral to pay or settle any liability, loss, or expense for which the undersigned would be obligated to indemnify the Surety under this agreement. Any unused portion of the cash or collateral will be returned to the undersigned upon termination of the liability of the Surety on the bond and the performance by the undersigned of all obligations to the Surety under this agreement. Surety shall have no obligation to invest, or pay interest, or provide a return on the cash or collateral deposited.
>
> It is expressly understood that Surety may be required to make payment in connection with any bond without prior notice to the undersigned and, in such case, the undersigned expressly waive any right to such prior notice.
>
> ***
>
> 4. DEFAULTS. Each of the following shall be considered a Default of this Agreement:
> (a) any abandonment, forfeiture, or breach of or refusal or inability to perform any contract covered by Bonds, or any breach of the Bonds;

---

[1] This defendant never appeared in the action.

2

4. On or about June 26, 2007, a performance bond (2220216) was issued to Washoe County on behalf of Rivana N. Fitzgerald and Robert L Fitzgerald as principals related to work to be completed at their home located at Holcomb Ranch Lane, Reno, Nevada. The parties have referred to this as Bond 216.

5. The most significant of these bonds related to the subdivision improvements and by June 25, 2008, the exposure to ICW on that bond had been reduced by the City of Reno to $499,854.

6. By April 2011, RQH had finished the majority of the work to be completed on subdivision 2A and attempted to obtain the release of the subdivision bond for Mountain View Estates unit 2A. It was unable to do so as the work on the adjacent property, Unit 1A, had not been completed.

7. Beginning in 2012, ICW and the then-management of RQH engaged in numerous email and verbal communications related to the status and completion of the project.

8. RQH continued to develop the Mountain View Estates and complete the bonded improvements and it and its then-principal, Robert N. Fitzgerald ("Fitzgerald"), provided periodic reports to ICW's agents to assure them that progress was being made and he and RQH would complete the project.

9. By August of 2013, Fitzgerald was reporting to ICW that the landscaping was about 65% complete and that about 10% of the site or subdivision work remained to be completed.

10. By September 2013 in response to an additional inquiry by ICW, Fitzgerald represented that the landscaping was then 80% complete and he was estimating total expenses to complete all bonded improvements to be between $250,000 and $300,000.

11. In February 2014, Fitzgerald represented to ICW that the landscaping had been completed and by April 2014 Fitzgerald represented that the remaining work related only to the subdivision bond on 1A and he estimated it to have a value of $110,000.

12. In June of 2015, the engineer of record submitted the current punch list items for Mountain View Estates Unit 1A and that report was admitted into evidence and supported by the testimony of the engineer of record, Raymond Pezonella. The results of that walk-through identified

3

approximately 19 items which needed to be addressed before the improvements would be accepted by the City of Reno. The majority of the items listed had been previously constructed and installed but were in need of repair or maintenance as a consequence of the use, damage or settlement which had occurred since the initial construction.

13. On September 11, 2015 Susan Karlan, vice president of ICW, inquired as to the status of the project and demanded that $854,314 be forwarded in a check to hold as cash collateral until the bonds were released.

14. In response on that same date, Fitzgerald explained that "the work covered by those bonds [was] 100% complete" and Karlan responded by asking if she could write to the obligee, the City Reno, to confirm that the bonds had been released.

15. On October 6, 2015, ICW again requested a status update, and received a response from Fitzgerald that "We are down to less than 40,000 dollars' worth of work left."

16. Fitzgerald later admitted that his previous representation of 100% was "a slight exaggeration."

17. On February 18, 2016, Mary Cobb of ICW sent an email to Fitzgerald. The email regarded Fitzgerald's September 11th statement that the projects the bonds covered were 100% complete and indicated that ICW had reached out to the City of Reno to confirm the statement. ICW had asked the City of Reno to return the bonds, but ICW had received no response from the city. The email concluded by requesting that Fitzgerald either obtain bond releases from the City of Reno or post collateral equal to the outstanding penal sum of all open bonds.

18. Fitzgerald responded with an inquiry as to whether a demand had been made on the bonds. Fitzgerald knew that there had not been a demand made and that if there was a concern, officials from the City of Reno, with whom he was working closely, would have informed him.

19. ICW's counsel then wrote to RQH, High Valley Development and all indemnitors on September 14, 2016. The correspondence demanded $929,859 collateral to cover contingent loses and expenses on the bonds and requested payment of unpaid premiums worth $12,573. None of the addresses on the letter were valid addresses for any of those persons at the time. Fitzgerald's parents, Rivana and Robert L. Fitzgerald, were deceased, and the 2440 Holcomb Ranch Lane

4

property, at which six of the letters were reportedly sent, had been lost to foreclosure approximately seven years earlier.

20. On December 13, 2016, ICW's counsel again wrote to the indemnitors. This correspondence was provided to Fitzgerald and in turn he called and spoke with ICW's counsel on December 23, 2016.

21. During the December 23, 2016 phone call, Fitzgerald provided an update that little work remained to be completed and therefore, Fitzgerald disputed that the collateral amount should be $929,000.

22. Sometime after January 11, 2017, ICW received payment of the unpaid premiums.

23. On January 27, 2017, ICW wrote to Fitzgerald requesting collateral for the remaining bonds.

24. On March 10, 2017, ICW, through counsel, again wrote to Fitzgerald requesting collateral, and referred to a telephone conversation where Fitzgerald stated that no collateral would be provided and that the remaining work would be finished in the spring.

25. On March 20, 2017 ICW wrote Fitzgerald again. The letter referenced a March 13, 2017 telephone conversation with Fitzgerald and again expressing concerns regarding the lack of collateral.

26. On April 7, 2017, ICW wrote Fitzgerald via email, following-up as to why it had not received promised information from Fitzgerald.

27. Fitzgerald did not view the letters from ICW's legal counsel as requesting status updates. However, he did understand the email received from ICW's counsel in April 2017 to be seeking status information. In an attempt to assure ICW that the exposure was insignificant, on April 26, 2017, Fitzgerald forwarded the walk-through punch list from 2015.

28. Just days later, the subject lawsuit was filed on May 8, 2017, asserting claims for breach of contract, quia timet, and specific performance.

29. On August 7, 2017 Pezonella and Associates, RQH's engineer-of-record, inspected the Mountain View Estates phase 1A, phase 1B, phase 2A, and the off-site sewer improvements

and made a determination with the City of Reno of the list of bonded items which needed to be addressed before the bonds could be released.

30. On October 9, 2017, the engineer of record, Raymond Pezonella ("Pezonella"), issued correspondence confirming that the bonded dedicated public improvements for the Mountain View subdivisions had been completed in substantial compliance with the City of Reno requirements. His testimony confirmed that at that point that there was no further exposure to the bonds.

31. It took two years from 2015, when construction of the project was essentially completed, to obtain the acceptance of the bonded improvements by the City of Reno. Many of the improvements had initially been constructed years earlier and had by that time fallen into disrepair. Subsequently, the improvements required repair, replacement, and maintenance before the City of Reno would accept dedication. Work was proceeding during that time, but new repair issues would arise from time to time. There were also delays due to City of Reno staff shortages, and significant backlog at the city.

32. On December 11, 2017, RQH sent a letter to ICW from its engineer stating that the "Request for Final Inspection" had been submitted to the City of Reno, that a walk-through had been conducted, that additional punch list items generated during the walkthrough had been completed, and that "packages" were going to be submitted to the City of Reno for file review that same day with anticipated review by the City Council in January 2018.

33. On March 14, 2018, the City of Reno released Bond No. 205607.

34. On April 30, 2018, the City of Reno released Bond Nos. 2205601, 2205602, 2205603 and 2205608.

35. On January 24, 2019, years after the work on the RQH bonds had been completed and the bonds released, ICW filed a Motion for Summary Judgment seeking that Defendants be ordered to post collateral security with ICW in the amount of $2,485 related to the faithful performance bond for subdivision improvements issued to Washoe County for Rivana and Robert L Fitzgerald, the deceased parents of Defendant Robert N. Fitzgerald, also referred to as the 216 bond. The motion also sought sums owed in premiums and reimbursement for attorney's fees and

costs of $24,412.03. The motion was fully briefed and after a hearing, was denied on August 21, 2019.

36. In the trial of this matter ICW abandoned any cause of action related to the 216 bond, and the only remaining claim is the breach of contract claim.

37. ICW submitted no invoices or receipts as evidence of the costs and fees it contends it incurred in this action and which it claims related to the alleged breach of contract. ICW has submitted no itemized statement of the payment or compromise, sworn to by an officer of ICW. Micah Schwartz, a consultant to ICW, confirmed verbally the fees and costs, but was unable to substantiate how those costs were incurred or separate which costs or fees were incurred for specific bonds.

## CONCLUSIONS OF LAW

**Breach of Contract Related to Reno Quality Homes Bonds**

1. At trial, ICW has contended that Defendants breached the Indemnity Agreement by failing to provide information related to the status of the project and to post collateral as demanded. A plaintiff in a breach of contract action must show "(1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach." Brown v. Kinross Gold U.S.A., Inc., 531 F. Supp. 2d 1234, 1240 (D. Nev. 2008), citing Saini v. Int'l Game Tech., 434 F.Supp.2d 913, 920–21 (D. Nev. 2006).

2. There is no dispute that there is a valid and existing contract.

3. The Court need not find as a matter of law whether or not the Answering Defendants breached the Indemnity Agreement, because Plaintiff has failed to provide evidence of damage as a result of any breach, and thus the Court must grant judgment to Defendants as a matter of law.

4. Nevada sureties may recover their expenses, including attorneys' fees, incurred in defending actions or claims on bonds. See, e.g., Transamerica Premier Ins. Co. v. Nelson, 878 P.2d 314, 317–18 (Nev. 1994). Parties may also recover attorneys' fees as special damages.

5. However, attorneys' fees, like all damages, require that the party seeking the damages prove both the fact of the damages and the amount thereof. Albios v. Horizon Cmtys. Inc., 132 P.3d 1022, 1034 (Nev. 2006) ("[A]ttorney fees requested as an element of damages must be specially pleaded and proved 'just as any other element of damages.").

7

6. In addition to seeking to recover attorneys' fees as special damages, ICW has also claimed a right to collect attorney's fees based upon a provision of the Indemnity Agreement. The provision in question states that "an itemized statement of the payment or compromise sworn to by an officer of the Surety, or the voucher or vouchers or other evidence of the payment or compromise. . . shall be prima facie evidence" of the amount of liability applies.

7. Whether pled as special damages or asserted pursuant to the Indemnity Agreement, the Court finds that ICW has failed to show that it is entitled to attorneys' fees and costs.

8. To the extent that ICW offers an "itemized statement" to the Court, the "statement" consisted only of the sworn testimony of Micah Schwartz, who is not an officer of ICW, but a claims administrator. Mr. Schwartz in turn bases his testimony on invoices that were not submitted into the record. The relationship between the unadmitted invoices and the bonds at issue in this case are wholly unsubstantiated. The Court finds this to be patently insufficient to demonstrate that ICW's actions and the fees related thereto were incurred in good faith as a result or in consequence to the issuance of a bond. Transamerica Premier Ins. Co. v. Nelson, 878 P.2d 314, 317 (Nev. 1994).

9. Speculative damages are not allowed and without evidence it is impossible for the Court to determine the relationship of the fees to any of the claims brought by ICW or if they were incurred in good faith. See Village Builders 96, L.P. v. U.S. Laboratories, Inc, 112 P.3d 1082, 1093 (Nev. 2005) (rejecting argument that documentation need not be required for "each copy made or each call placed" and noting that "such documentation is precisely what is required under Nevada law to ensure that the costs awarded are only those costs actually incurred.").

10. Without that information no such award is appropriate regardless of whether there is a basis to find liability. See Golden Rd. Motor Inn, Inc. v. Islam, 376 P.3d 151, 160 (Nev. 2016) (reversing an award of attorney fees where opposing party was not permitted to review itemized fees); Bobby Berosini, Ltd v. People for the Ethical Treatment of Animals, 971 P.2d 383, 386 (Nev. 1998) (reversing an award of costs and attorneys' fees for failure to provide sufficient itemization).

11. In light of the absence of evidence of any damages this Court finds in favor of Defendants and finds that no fees should be otherwise awarded to ICW pursuant to the Indemnity Agreement.

## **CONCLUSION**

The Court finds in favor of Defendants on all claims. The Clerk of the Court is instructed to enter judgment accordingly and close the case.

DATED this 5th day of March, 2020.

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**